**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PPO CHECK, LTD.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 07 CV 4767** |
| **v.** | ) | |
| | ) | **Judge Joan H. Lefkow** |
| **MIDWESTERN REGIONAL** | ) | |
| **MEDICAL CENTER,** | ) | |
| **SOUTHWESTERN REGIONAL** | ) | |
| **MEDICAL CENTER, and CANCER** | ) | |
| **TREATMENT CENTERS OF** | ) | |
| **AMERICA, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, PPO Check, Ltd. ("PPO Check"), filed a one-count complaint against

defendants, Midwestern Regional Medical Center ("MRMC"), Southwestern Regional Medical

Center ("SRMC"), and Cancer Treatment Centers of America, Inc. ("CTCAI"), for breach of

contract. In short, PPO Check alleges that defendants failed to pay a 50% contingent fee due for

certain amounts that defendants recovered as a result of PPO Check's auditing of MRMC and

SRMC's patient accounts for underpayments.

Before the court are plaintiff's motion for partial summary judgment and defendants'

cross-motion for summary judgment. For the following reasons, plaintiff's motion [#58] will be

denied, and defendants' motion [#70] will be granted in part and denied in part.

## JURISDICTION

The court has jurisdiction to hear this case pursuant to 28 U.S.C. § 1332, as the plaintiff

is a citizen of a different state from any of the defendants and the amount in controversy exceeds

$75,000. Although this case was originally filed in a Texas state court, it was removed to the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. §§ 1441 and 1446 and subsequently transferred to this court.

## LEGAL STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in the depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) & advisory committee's notes.

The party seeking summary judgment bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact is one that might affect the outcome of the suit. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

# BACKGROUND[1]

MRMC and SRMC ("the defendant hospitals") are acute care hospitals located in Zion,
Illinois and Tulsa, Oklahoma, respectively.  CTCAI is a separate corporation which provides
marketing, billing, information technology, and other business and management services to
MRMC and SRMC, as well as other healthcare businesses.

In 2003, PPO Check entered into a hospital service agreement (the "HSA") with the
defendant hospitals to perform auditing and collection services on underpaid accounts of MRMC
and SRMC.  The HSA describes PPO Check's scope of work as follows:

1. PPO CHECK SERVICES.

    1.1    <u>PPO Check Audit</u>.  PPO Check will audit patient accounts determined and
provided by CTCA[2] in its discretion on an ongoing basis for the purpose
of identifying patient account claims that have been improperly underpaid,
in whole or in part, (each such identified account being hereinafter
referred to as an "Account" and collectively as "Accounts").

* * *

    1.3    <u>PPO Check Auditing Efforts</u>.

    a.    After receipt of the appropriate claim data and information, PPO
Check will use reasonable efforts to coordinate additional payment
due CTCA on Accounts to which CTCA may be entitled additional
insurance payment, as well as to compromise and settle all
Accounts and known claims relating thereto.

---

[1] Unless otherwise stated, both sides have admitted the following facts.

[2] The HSA expressly defines "CTCA" as a shorthand reference to MRMC and SRMC,
collectively.  Pl.'s SoF, Ex. 4 (the HSA), at 1.  Although plaintiff argues that CTCAI, the third
defendant named in this case, is a guarantor of the defendant hospitals' obligations under the
agreement, at no point does the HSA refer to either "Cancer Treatment Centers of America, Inc."
or "CTCAI."  This issue is the ground for defendants' motion for summary judgment as to
defendant CTCAI, which is addressed below.

> b. In this connection, PPO Check will use reasonable efforts to recover unpaid or underpaid claims, including, without limitation, silent PPO's, erroneous managed-care discounts, timely-payment violations, underpayments, and wrongful denials. PPO Check will reasonably manage the collection of any improperly paid Account and, as indicated hereinafter, will receive CTCA's reasonable cooperation in coordinating reimbursement payments from payors.
>
> c. CTCA and PPO Check shall agree that managed care discounts and/or contract rates will not be honored when (1) a discount arrangement is not specifically disclosed in a patient's insurance plan/policy, and/or (2) a CTCA managed-care contract is breached or partially breached, and/or (3) federal or state laws, rules, or regulations have been violated.

Pl.'s SoF, Ex. 4 (the HSA), at 1.

The HSA further provided that PPO Check was to be paid a contingent fee of 50% for economic benefits obtained by the defendant hospitals as a result of the parties' agreement, as follows:

> 3. COMPENSATION.
>
> 3.1 <u>Compensation to PPO Check</u>. For services rendered by PPO Check, CTCA shall compensate PPO Check 50% (fifty percent) of the amount actually paid to the CTCA as a result of this Agreement. CTCA shall issue payment to PPO Check at Harris County, Texas (or at such other location as PPO Check may specify) on a periodic (monthly) basis for PPO Check's portion of monthly collections actually received.
>
> PPO Check will be compensated for its services only if a recovery is actually obtained by CTCA. In addition, if an Account or claim is such that the compensation allowed to PPO Check is set by law, the compensation to be paid PPO Check will be limited to the maximum so allowed by law. CTCA will not settle any Account or claim which PPO Check is handling without prior consultation with PPO Check.
>
> 3.2 <u>Collection</u>. For purposes of this section, "collected" means (1) funds paid by payors and received by CTCA against Accounts, whether by check, credit, or other economic benefit, and (2) if payment is by check, cleared and collected funds.

3.3 <u>Calculation and Explanation of Contingency Invoices</u>.  The percentage paid to PPO Check on each account will be calculated before expenses are deducted from the amount of the recovery.  PPO Check intends to report to CTCA by invoice on a monthly basis and in such invoice provide CTCA a statement clearly detailing the determination of compensation and the remittance then due PPO Check.

Pl.'s SoF, Ex. 4 (the HSA), at 2–3.

Beginning in July 2003, the defendant hospitals transmitted 8369 patient accounts to PPO Check for services contemplated under the HSA.  PPO Check immediately began working on these accounts and was able to recover over $5.1 million for the defendant hospitals as a result of its audit findings on 1484 accounts.  Of that $5.1 million (on 1484 accounts), roughly $4.0 million (on 1152 accounts) involved inappropriate discounts taken by clients of Multiplan, Inc. ("Multiplan").  Multiplan is a network provider that is in the business of creating and managing networks of hospitals that agree to sell medical services at a discounted rate to Multiplan's clients, most of whom are insurance companies.

In addition to the 1152 Multiplan-related accounts on which PPO Check recovered the $4.0 million, PPO Check also audited another 3738 accounts involving Multiplan clients.  PPO Check's audit findings on those 3738 accounts revealed underpayments of approximately $14.8 million.[3]  As discussed in further detail below, the compensation defendants allegedly received for settling those 3738 accounts is the subject of this lawsuit.

In August 2004, Multiplan contacted defendants to complain about PPO Check's auditing and collection efforts.  Specifically, Multiplan's Senior Vice President, Dan Dragalin, sent

---

[3] While defendants "substantially agree" with this statement, they "question[] the accuracy" of PPO Check's audit findings of $14.8 million in underpayments on these accounts. Defs.' Resp. to Pl.'s SoF ¶ 17.

MRMC's President, Roger Cary, a letter requesting a meeting to discuss what Multiplan characterized as "inappropriate collection activity being pursued by PPO Check." Defs.' Resp. to Pl.'s SoF ¶ 18.

In October 2004, Dragalin and CTCAI's Vice President of Patient Accounts, Nora Orrick, began negotiations. During these negotiations, Orrick wanted, among other things, a favorable contract with Multiplan for both MRMC and SRMC. Dragalin, on the other hand, testified that he wanted (1) a contract ensuring that Multiplan's clients would have access to discounted rates at the defendant hospitals and (2) to resolve concerns regarding PPO Check's efforts to collect on discounts taken by Multiplan's clients.[4]

---

[4] Plaintiff asserts that "the '*most critical*' thing to Dragalin was that Defendants agree to release Multiplan's clients from any claims related to the 3738 Accounts." Pl.'s SoF ¶ 21 (emphasis added). In support of this assertion, plaintiff cites a number sources, including portions of the depositions of Orrick and Dragalin and a number of exhibits to those depositions. The apparent source of the quoted language ("most critical") is a January 19, 2005 email to Orrick and others in which Dragalin states,

> Finally, and *most critical* to us, given the willingness of both sides to address these issues, would it be possible to call a cease fire for a limited period while we have our discussions. Could you direct ppocheck to cease activities against our clients while we are in discussions. We could put a time limit on the cease fire - say two months - to assure that we devote the proper effort to solving this.

Dragalin's Dep. (Pl.'s SoF, Ex. 8), Ex. 13, at 2 (emphasis added). Plaintiff also cites an email from Orrick to PPO Check's President, Gary Stankowski, dated December 2, 2004 in which she stated, "Next week Dan Draglin [*sic*] wants to discuss the stand-off situation between his clients and us as a result of PPOCheck's efforts to collect on discounts." Defs.' Resp. to Pl.'s SoF ¶ 22.

Neither the quoted language from those emails nor the cited portions of Orrick and Dragalin's deposition testimony (discussing their respective emails), however, support plaintiff's assertion that Dragalin's primary concern was that defendants agree to release Multiplan's clients from any claims related to the 3738 accounts. Rather, such evidence indicates, at most, that Dragalin's primary interest at the time of the email was obtaining a *temporary* hiatus from PPO Check's auditing and collection efforts against Multiplan clients.

Defendants, moreover, have cited competent evidence that Dragalin's primary objective was to obtain a contract ensuring that Multiplan's clients would have access to discounted rates

Shortly thereafter, the defendant hospitals entered into a contract with Multiplan, effective January 1, 2005 (the "January 2005 Agreement"). Plaintiff contends that the January 2005 Agreement was "extremely favorable to MRMC and SRMC," as it provided for a 10% discount off of the defendant hospitals' rates—substantially lower than 25%, which, according to plaintiff, was the best discount the defendant hospitals had ever previously received in their contracts with Multiplan. Pl.'s SoF ¶¶ 23, 24. Defendants dispute plaintiff's characterization of the January 2005 Agreement as "extremely favorable to MRMC and SRMC," citing evidence that it (a) was no more favorable to the defendant hospitals than the contracts they had with any other network provider and (b) provided a discount that approximated the average discount that Multiplan received at that time from other similarly situated hospitals.[5]

Defendants have stipulated that, from January 2005 through September 2007, the total dollar amount of the discounts taken by Multiplan's clients under the January 2005 Agreement is approximately $19.6 million. On the basis of that figure, plaintiff asserts that "[u]nder the previous discount rate (25%), the total discounts would have been approximately $48 million—or, in other words, the new discount rate saved the hospitals nearly $30 million in revenue." Pl.'s Mot. at 6.

---

at the defendant hospitals. Dragalin's Dep. (Pl.'s SoF, Ex. 8) at 46:2–7, 54:13–55:15 ("Our primary objective was to get access back as rapidly as possible, because we already had clients using Midwest Regional during that period of time that we didn't have the contract, and they were, obviously, losing dollars by continuing to use the hospital without our having the contract.").

[5] Defendants also point out that the previous contracts that the defendant hospitals had with Multiplan, which admittedly provided for a 25% discount, terminated in 1998, well before the time period at issue in this case. Defendants further cite evidence indicating that prior to the January 2005 Agreement, one of the two defendant hospitals had a contract with Multiplan that actually provided for a 10% discount.

During the negotiations of the January 2005 Agreement, Dragalin tried to change the 10% discount figure back to 25%, because that was the "former [Multiplan] rate" with MRMC. Defs.' Resp. to Pl.'s SoF ¶ 25. Plaintiff points out that although Dragalin ultimately agreed to accept the 10% rate, he did so with the understanding that he and Orrick would revisit the issue within 12 months. Defendants, on the other hand, cite Dragalin's deposition testimony suggesting that Multiplan would have agreed to a contract with the defendant hospitals "almost no matter what." Dragalin's Dep. (Pl.'s SoF, Ex. 8) at 55:3–5.

On January 8, 2005, Orrick sent an email to PPO Check's President, Gary Stankowski, in which she stated,

> Multiplan has requested a meeting to resolve the PPO Check issue now that we have a contract. I was aware they wanted to do that and *used it as leverage to get the contract we wanted* which protects us from inappropriate discounts. We know there are still some dollars on the table but it has been winding down since we cancelled several contracts last spring/summer. Do you have any idea (or better yet a report) of what is still pending from the data you have? I would like to get to a place with Multiplan that we can assure them we will not pursue any additional monies and settle on what we think is fair. Please advise.

Defs.' Resp. to Pl.'s SoF ¶ 27. At her deposition, Orrick testified that "the contract we wanted" refers to the January 2005 Agreement and that the statements she made in the email were "accurate." *Id.*

On January 14, 2005, in response to Orrick's request, Stankowski emailed her two spreadsheets (the "Spreadsheets") containing PPO Check's audit findings concerning the 3738 accounts. In his email, Stankowski noted the following:

> As per your request, please find attached 2 spreadsheets containing all the CTCA claims (on our system) we believe were subjected to noncompliant (a/o silent PPO, etc.) Multiplan, BCE Emergis, UP&UP, AHP, HPO, etc. ("Multiplan") network contract discounts . . . .

Defs.' Resp. to Pl.'s SoF ¶ 28.  The attached spreadsheets contained detailed information disclosing what PPO Check believed to be roughly $14.75 million in noncompliant discounts taken in connection with the 3738 accounts.

On January 17, 2005, Orrick emailed the Spreadsheets to Dragalin.  In her email, Orrick stated the following:

> I thought it might be helpful for you to view the unauthorized discount reports (one for Midwestern Regional Medical Center and one for Southwestern Regional Medical Center) that we are working from before today's meeting if you had a chance.  These are claims we hired PPO Check to pursue on our behalf.  I feel very good that our new contract eliminates the unauthorized discount problem on a go forward basis and I am looking forward to resolving these prior discount issues for the claims on this report.

Defs.' Resp. to Pl.'s SoF ¶ 29.  Defendants and Multiplan then proceeded to spend the next several months in negotiations concerning the 3738 accounts.

In August 2005, Multiplan and defendants reached an agreement (the "August 2005 Amendments") that included, *inter alia*, the following provisions:

• the 10% discount rate specified in the January 2005 Agreement would no longer be terminable at will and, instead, would be locked-in for five years at the following staggered discount rates:  10% through June 30, 2007, and then 15% through June 30, 2010;

• defendants and Multiplan mutually released each other from all claims and causes of actions associated with services rendered by defendants on or before December 31, 2004, with such release by defendants applying equally to all of Multiplan's clients; and

• Multiplan would pay defendants $750,000 by August 31, 2005.

Orrick's Dep. (Pl.'s SoF, Ex. 7), Ex. 25, at MRMC 00262–64.[6]

On September 1, 2005, Orrick sent an email to Stankowski in which she stated the

following:

> CTCA and Multiplan signed a mutual release relating to all prior services. That mutual release provides that CTCA will cease any further pursuit of Multiplan or their clients for inappropriate discounts and Multiplan and their clients will not assert any claims against CTCA for inappropriate billing or treatment. As a result of this new arrangement, we will no longer need to utilize PPO Check to review Multiplan claims.

> We very much want to thank you for your efforts on our behalf, the successes we have both enjoyed, and advise you that we wish to continue to utilize your services monitoring other networks as you have been doing over the past few months.

Defs.' Resp. to Pl.'s SoF ¶ 34. Defendants admit that they did not inform PPO Check of either

(1) the locked-in discount rates they had negotiated with Multiplan for the next five years or

(2) the $750,000 payment they received from Multiplan.

On September 2, 2005, Orrick forwarded to defendants' general counsel, Steve Kroll, the

email she had sent to Stankowski the previous day and stated,

> Steve, I sent this to Gary yesterday. I am going on vacation until 9/12, so I called his office to tell them that I was going to be out of the office and see if he received it and if he had did he have any questions, basically I wanted to test the waters. His office said he was in but then came back on the line and said he stepped out, so I asked to be transferred to his voicemail. He did not return my call. This could be a sign that he is formulating their official response or it could be that he doesn't have an issue with it. I will keep you posted. Thanks—Nora.

Defs.' Resp. to Pl.'s SoF ¶ 36. In response to Orrick's email, Kroll wrote back,

> I am sure they are formulating their response. We'll deal with it when their attorneys call.

---

[6] The August 2005 Amendments were originally drafted as a single document but, at Multiplan's request, were ultimately memorialized in two separate documents. Nevertheless, the parties agree that the provisions in the two documents reflect a single agreement between the parties.

Defs.' Resp. to Pl.'s SoF ¶ 37.[7]  Plaintiff contends that Kroll's response "reflects Defendants' willful breach of their duty to pay PPO Check its contractual fee for using PPO Check's audit findings."  Pl.'s Mot. at 10.  Defendants, on the other hand, cite Kroll's deposition testimony that he made this remark "in order to convey to Ms. Orrick that he generally did not become involved in 'business spats' until other attorneys became involved."  Defs.' Resp. to Pl.'s SoF ¶ 37.

In October 2006, PPO Check filed this lawsuit, alleging that defendants had failed to pay the 50% contingent fee due for the economic benefits they received as a result of PPO Check's auditing work concerning the 3738 accounts.

## DISCUSSION

## I.      PPO Check's Motion for Partial Summary Judgment

PPO Check has moved for summary judgment of liability on it breach of contract claim as a matter of law.  In support of its motion, PPO Check first notes that it is undisputed that the HSA is a valid and binding contract and is governed by Texas law.  Plaintiff further asserts that it is undisputed that defendants (1) requested and received PPO Check's audit findings concerning the 3738 accounts; (2) used those finding in their negotiations with Multiplan; (3)

---

[7]  In their response to plaintiff's Local Rule 56.1 Statement of Material Facts, defendants object to the admission of these emails between Orrick and Kroll on the basis of the attorney–client privilege.  Defendants assert that the emails were inadvertently produced to plaintiff and ask that the court disregard them.  Beyond their conclusory assertion that the emails are privileged, however, defendants offer no explanation or argument as to either (a) why the emails are privileged or (b) why defendants have not already waived any such privilege as to these emails.  It is well established that the party asserting the privilege carries the burden of showing that the communication at issue was made by a client to her lawyer for the purpose of obtaining legal advice.  *United States* v. *BDO Seidman*, 337 F.3d 802, 811 (7th Cir. 2003).  Defendants have fallen far short of meeting that burden here, and their objections are therefore overruled.  *See, e.g.*, *In re Pfohl Bros. Landfill Lit.*, 175 F.R.D. 13, 21 (W.D.N.Y. 1997) ("Mere conclusory or *ipse dixit* assertions of privilege are insufficient to satisfy [a party's] burden" of demonstrating the applicability of the privilege.).

ultimately entered into an agreement with Multiplan in which Multiplan and its clients were released from all claims related to those 3738 accounts. Thus, PPO Check argues, while there may be a triable issue of fact as to the precise dollar amount of the value of the consideration defendants received in exchange for that release, there is no triable issue of fact as to whether PPO Check is entitled to its 50% contingent fee.

In support of its motion for summary judgment, PPO Check relies primarily on *Municipal Administrative Services, Inc.* v. *City of Beaumont*, 969 S.W.2d 31 (Tex. Ct. App.—Texarkana 1998) (hereinafter "*MAS*"). In that case, the plaintiff, Municipal Administrative Services, Inc. ("MAS"), conducted "franchise compliance audits" for cities. *Id.* at 34. A franchise in that context was a contract between the city and a public utility governing the utility's operation within the city. *Id.* In other words, MAS performed audits for cities to make sure they were not being underpaid by utilities under the terms of their franchise agreements.

MAS's contract with the defendant, City of Beaumont (the "City"), required "payment to MAS of fifty percent of any amounts recovered, refunded, or credited to the City *as a result of* any of the audit findings." *Id.* at 36. Beginning in 1987, MAS audited the defendant City of Beaumont's franchise with Southwestern Bell ("SWB"). *Id.* In a February 1988 report, MAS told the City that SWB had not been properly paying the City on all revenue accounts and listed those accounts by category and number. *Id.* MAS estimated that SWB owed the City an amount in excess of $1 million. *Id.* The court found evidence demonstrating that

> after receiving the report, the City made MAS's findings available to SWB and used them to attempt collection from SWB. As late as September 1990, the City used MAS's findings when discussing with a Beaumont law firm the possibility of filing a lawsuit to

12

collect against SWB. In 1991 or 1992, the City and SWB began negotiating a new franchise agreement using MAS's findings.

*Id.* at 36–37. Ultimately, the City's attempts at settlement with SWB failed. *Id.* In February 1992, the City hired contingent-fee attorneys and, along with a number of other Texas cities, joined a class action against SWB for breach of franchise. *Id.* at 37.

In September 1995, the City joined in a settlement of the class action under which its share of the settlement was approximately $1.7 million. *Id.* When the City refused to pay MAS 50% of the settlement it had obtained, MAS sued the City for breach of contract. After a trial, MAS obtained a jury verdict of $842,307, which was equal to 50% of the City's portion of the settlement. *Id.*

Following the jury's verdict, the trial court entered a judgment *non obstante veredicto* (n.o.v.). *Id.* at 33. On appeal, the Texas court of appeals reversed, finding that "the evidence supports the jury's finding that MAS's franchise audit summary findings resulted in collection of money by the City." *Id.* at 37.

As detailed above, the HSA in this case, similar to the audit contract in *MAS*, provided that defendants would pay PPO Check "50% (fifty percent) of the amount actually paid to [the defendant hospitals] *as a result of* this Agreement." Defs.' Resp. to Pl.'s SoF ¶ 9 (emphasis added). PPO Check contends that here, much as in *MAS*, the evidence demonstrates that defendants obtained financial consideration from Multiplan "as a result of" the HSA.

 Defendants assert a number of arguments in opposition to PPO Check's motion for partial summary judgment. First, defendants argue that under the specific terms of the HSA, PPO Check is not entitled to compensation because the defendant hospitals received no payment from any payor against patient accounts, as required by the HSA. Quoting the language of the

HSA, defendants assert that PPO Check's compensation was to be based on "PPO Check's portion of monthly *collections* actually received," and that "'collected' means . . . funds paid by *payors* and received by CTCA against *Accounts*."  Pl.'s SoF, Ex. 4 (the HSA), at 2–3 (emphasis added).  Defendants contend that under the terms of the HSA, Multiplan is not a "payor" and that any consideration paid by Multiplan to defendants was not received "against Accounts."  The record, however, does not support either of these contentions.

As to "payor," defendants argue that the term is intended in the HSA, and broadly understood within the field of medical collections, to refer to an insurance company, health plan or administrator, or entity responsible for the payment of a patient account.  In their response to plaintiff's statement of material facts, however, defendants' have broadly asserted that the HSA contains "no mistakes, errors, omissions or ambiguities in the HSA," Defs.' Resp. to Pl.'s SoF ¶ 10, and, as defendants concede, the term "payor" is not defined in the HSA.  *See, e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh, PA* v. *CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) ("Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument.") (citations omitted).  Furthermore, as plaintiff points out, the HSA states that the defendant hospitals will pay PPO Check a 50% contingent fee for any "amount actually paid to the [defendant hospitals] as a result of this Agreement," *id.*, and the agreement does not set out an exception for payments that are not made by a "payor."

Additionally, plaintiff has presented evidence that Multiplan obtained the release and made the $750,000 payment to defendants on behalf of its clients.  Thus, even if the court were

to accept defendants' narrow definition of the term "payor," Multiplan's clients—insurance companies—would fit that definition.

As to "Accounts," defendants argue that the term is defined in the HSA as specific patient accounts that have been improperly underpaid. No payment was made against such an account, defendants argue, because (a) Multiplan made the $750,000 payment only to defendant CTCAI, not to the defendant hospitals, and (b) the August 2005 amendments make no reference to PPO Check, the Spreadsheets, or any specific patient accounts. Plaintiff, however, has submitted evidence indicating that (a) CTCAI received the $750,000 on behalf of the defendant hospitals and passed those funds on to MRMC and SRMC, and (b) the release was intended to and did release the 3738 claims listed in the Spreadsheets—items which are indisputably "Accounts" under the terms of the HSA.

Second, defendants argue that plaintiff's interpretation of the HSA is unreasonable because it "ignores the parties' intentions as expressed in the four corners of the HSA." Defs.' Resp. & Cross-Mot. at 2, 11. In support of this argument, defendants rely primarily on their assertions that (a) the HSA provides that "PPO check was not engaged to perform any other services other than *collection* efforts," *id.* at 11, and (b) PPO Check's interpretation of the HSA would render those provisions meaningless. Section 1 of the HSA, however, makes clear that PPO Check was likewise, if not primarily, engaged to perform auditing services—"for the purpose of *identifying* patient account claims that have been improperly underpaid, in whole or in part." Pl.'s SoF, Ex. 4 (the HSA), at 1 (emphasis added); *see also id.* § 1.1 (entitled "PPO Check Audit"); *id.* § 1.3 (entitled "PPO Check Auditing Efforts").

Third, defendants argue that plaintiff's interpretation of the HSA is unsupported by the parties' course of dealing. Specifically, they assert that the HSA "stated PPO Check's intention 'to report to [the defendant hospitals] by invoice on a monthly basis' which would 'provide [the defendant hospitals] a statement clearly detailing the determination [of] the compensation and the remittance then due PPO Check.'" Defs.' Resp. & Cross-Mot. at 12 (quoting §3.3 of the HSA). Thus, defendants contend, because PPO Check never sent defendants an invoice for the payments at issue in this lawsuit, its breach of contract claim must fail. The provision cited by defendants, however, states only that "PPO Check's intends" to provide monthly invoices, Pl.'s SoF, Ex. 4 (the HSA), at 3, and neither requires that PPO Check do so nor states that PPO Check is otherwise not entitled to compensation under the HSA. Moreover, as plaintiff points out, defendants did not inform PPO Check about either the $750,000 check or the locked-in discount rate they received pursuant to the August 2005 Amendments. Clearly, PPO Check could not have invoiced the defendant hospitals for a 50% contingent fee based on compensation of which PPO Check was not aware.

Fourth, defendants argue in the alternative that the HSA is ambiguous and therefore should be construed against PPO Check, the drafter of the HSA. As plaintiff points out, however, defendants never identify what that ambiguity might be, let alone why it should be resolved in defendants' favor.

Finally, defendants point out that in *MAS*, the primary authority on which PPO Check relies, the court held only that there was "more than a scintilla of competent evidence to support the jury's finding." 969 S.W.2d at 34. Accordingly, defendants argue, *MAS* does not stand for the proposition that summary judgment should have been granted in favor of the plaintiff in that

case.  In a similar vein, defendants also argue that summary judgment of liability should be denied because a determination of liability under the HSA is inextricably entwined with issues of causation and damages.

This last set of arguments presents a closer question.  On the one hand, plaintiff has cited evidence that during the negotiations between defendants and Multiplan, (1) Dragalin (on behalf of Multiplan) wanted to resolve concerns regarding PPO Check's efforts to collect on discounts taken by Multiplan's clients, and (2) Orrick (on behalf of defendants) used the Spreadsheets prepared by PPO Check as leverage.  On the other hand, defendants have cited evidence indicating that during those negotiations, (1) Dragalin's primary objective was to obtain a contract ensuring that Multiplan's clients would have access to discounted rates at the defendant hospitals and (2) Multiplan would have agreed to a contract with the defendant hospitals "almost no matter what."  Dragalin's Dep. (Pl.'s SoF, Ex. 8) at 55:3–5.  Additionally, defendants have pointed out that (3) neither the January 2005 Agreement nor the August 2005 Amendments specifically reference either PPO Check or the 3738 accounts; (4) defendants' release covered not just the 3738 accounts but *all* claims against Multiplan and its clients regarding services rendered by the defendant hospitals before 2005; and (5) the release was mutual, providing that Multiplan likewise released defendants from all claims for inappropriate billing or treatment related to services rendered by the defendant hospitals during the same period.

While plaintiff has provided evidence sufficient to demonstrate that defendants received valuable consideration "as a result of" the HSA, it has not established that there is no genuine issue of material fact as to that question.  Rather, as listed above, defendants have cited various items of evidence indicating that the January 2005 Agreement and the August 2005 Amendments

concerned much more than the 3738 accounts that PPO Check audited. There is thus an issue of fact not only with respect to the precise dollar value of any consideration defendants may have received as a result of the HSA, as plaintiff concedes, but also as to whether PPO Check's services economically benefitted defendants in their negotiation of the January 2005 Agreement and the August 2005 Amendments.

Plaintiff's motion for partial summary judgment must therefore be denied.

## II.     Defendants' Cross-Motion for Summary Judgment

In their cross-motion for summary judgment, defendants assert two separate lines of argument. First, they argue that summary judgment in favor of all defendants is required because plaintiff is not a party to the HSA and therefore lacks standing to bring this lawsuit. Defendants cite the first sentence of the HSA, which states that it is an agreement between "PPO Check, Ltd. (hereinafter "PPO Check") a Texas *company*" and the defendant hospitals, Pl.'s SoF, Ex. 4 (the HSA), at 1 (emphasis added), whereas the plaintiff in this case has identified itself as "PPO Check, Ltd. . . . a limited liability *partnership* formed under the laws of the state of Texas." Pl.'s Resp. to Defs.' SoF ¶ 1. Defendants also suggest that because Gary Stankowski signed the HSA as "Vice President" of PPO Check, the contracting party must have been a company rather than a partnership.

While the HSA's reference to PPO Check, Ltd. as a "company," as opposed to a partnership, creates some potential for ambiguity, defendants have not demonstrated that there is no issue of material fact as to whether plaintiff is the contracting party. Both the entity identified in the HSA and the plaintiff have the same name, "PPO Check, Ltd.," and defendants have not

shown that a "PPO Check, Ltd." other than the plaintiff partnership has ever existed.[8]

Furthermore, the defendant hospitals have previously admitted (in their responses to plaintiff's requests for admission) that the HSA reflects a valid and enforceable contract between them and PPO Check. Their newfound contention that plaintiff is not the contracting party is simply too late and inadequately supported to merit summary judgment on that basis.

Second, defendants argue that summary judgment must be granted as to defendant CTCAI, because CTCAI is neither a party to, nor guarantor of, the HSA. The parties do not dispute that CTCAI is a separate corporation from either of the defendant hospitals. The HSA states that it is an agreement between PPO Check, Ltd. and "Midwestern Regional Medical Center Inc., an Illinois corporation and Southwestern Regional Medical Center Inc., an Oklahoma corporation (*hereinafter collectively, 'CTCA'*)." Pl.'s SoF, Ex. 4 (the HSA), at 1 (emphasis added). At no point does the HSA refer to either "Cancer Treatment Centers of America, Inc." or "CTCAI."

In response, plaintiff argues that CTCAI is a guarantor of the agreement, relying on various items in support thereof. First, plaintiff cites section 4.2 of the HSA, which provides that "CTCA will unconditionally and irrevocably guarantee the payment obligations of CTCA under the HSA . . . ." *Id.* at 3. Plaintiff also asserts that the individuals who signed the HSA on behalf of CTCA are in fact officers of CTCAI. Such evidence, however, cannot overcome the HSA's clear definition of "CTCA" as the defendant hospitals, MRMC and SRMC, as opposed to

---

[8] In defendants' reply memorandum in support of their cross-motion for summary judgment, they argue for the first time that the contracting party is actually "PPO Check L.L.C.," a Texas limited liability company. Defs.' Reply at 1–2. On their faces, however, "PPO Check L.L.C." and "PPO Check, Ltd." are different names.

CTCAI. *See Williams* v. *J. & C. Royalty Co.*, 254 S.W.2d 178, 180 (Tex. Civ. App. Ct.—San Antonio 1952) ("When contracting parties set forth their own definitions of the terms they employ, the courts are not at liberty to disregard such definitions and substitute other word meanings . . . .").

Additionally, plaintiff cites a number of items of evidence outside the terms of the HSA. For example, plaintiff argues that the HSA's guaranty clause must be referring to CTCAI because (1) the parties' negotiations and pre-execution drafts of the HSA indicate such an intent, and (2) "Defendants never stated and Plaintiff never understood that MRMC and SRMC would serve as guarantors for themselves." Pl.'s Reply at 26. Plaintiff argues that such extrinsic evidence should be taken into consideration because the guarantor provision "is ambiguous because it purports to have 'CTCA' be the guarantor for 'CTCA,' which makes no sense." *Id.* at 25.

As defendants point out, however, the HSA expressly defines "CTCA" as a shorthand reference to MRMC and SRMC, collectively, and the guaranty clause can reasonably be read as a cross-guaranty provision whereby each of the defendant hospitals guaranteed the performance of the other. It is well established under Texas law, that "[i]f contract language can be given a certain or definite meaning, then it is not ambiguous; it should be interpreted by a court as a matter of law." *Universal Health Servs., Inc.* v. *Renaissance Women's Grp., P.A.*, 121 S.W.3d 742, 746 (Tex. 2003). The court must therefore grant defendants' motion for summary judgment as to defendant CTCAI.

**CONCLUSION**

For the reasons discussed above, plaintiff's motion for partial summary judgment [#58] is denied, and defendants' cross-motion for summary judgment [#70] is granted in part and denied in part. Defendant Cancer Treatment Centers of America, Inc. is dismissed.

The case will be referred to a magistrate judge for settlement conference. A status hearing is set for June 2, 2009 at 9:30 a.m. In the meantime, the parties are directed to confer with each other to discuss the possibility of pre-trial settlement.


Dated: March 20, 2009                    Enter:_____

                                        JOAN HUMPHREY LEFKOW
                                        United States District Judge